Good morning, ladies and gentlemen. Welcome, Judges Bumate and Pius, and I welcome you to the Ninth Circuit. We have a number of, I think we have three cases on for argument today and we have a number of submitted matters. I'm just going to submit the submitted matters. I'll handle those previously at first, and then we'll go into the other, and then I'll explain the other, how we handle oral arguments. So, let's see, we've got Remus Cosman-Mihaly and Laura Mihaly v. Todd Blanche, 25-3097. That's been submitted on the briefs and will be submitted as of this date. Carissa Boisvert v. Experian, 25-5387, submitted on the briefs, submitted as of this date. And then we have the other matters for argument, and so generally I will call them in the order that they're on the calendar, and by your case, you have a certain time period, and if you are the appellant, that includes your rebuttal time as well. That would be your total time. For example, in the first case, it's 10 minutes each side, so the appellant would have 10 minutes total, and if you wish to reserve any time for rebuttal aspirationally, it's your responsibility to keep track of your time, but if you tell me how much time you would like to reserve, I'm looking at the clock and I'll try to remind you. The clock counts down, then it goes up, and that doesn't mean I gave you extra time, it means you moved into overtime. But I understand that everyone came here to say something, and we hope you get to say that, but we also have questions and we have to decide your case. So if your time has run out, and one of the panel members here is asking you a question, you don't need to ask permission to proceed. Answer any questions that we have. As long as my colleagues have questions, please continue to answer those questions. Now, I know we have a couple of, we have, well, UCI, I guess, is here on two different cases, and you're the appellees in those cases, so that would be your total time, and I notice on each of those cases, you have designated on the calendar how much time each person would like to take. And so, one thing that I, when people divide time, I will tell you that if you're the first person, and you're going on, and then the judges are asking you questions, and you go over, I look at the second person thinking, like, oh my gosh, they're taking up all my time. Should I leap to the podium and pull them down, or what should I do? As long as we're asking questions of the first person, the second person will get their time. So you don't need to be concerned about that. But otherwise, if you are the first person, please be respectful. If we're not asking you questions, conclude at the time, or I'll call the time on that. This has kind of been our week for law students, so we love that. And it's been, and also pro bono, we're happy for everyone that comes, and thank you all for your argument here today. We, I would like to, on behalf of the panel, thank in advance those individuals that are doing pro bono work, because through our pro bono program, it's always helpful to us in deciding those cases to have them be well briefed. And if you're students here doing it, don't worry, everyone's always nervous when they have oral argument. Anyone that's not nervous is probably lying to you. So nervous can be a good thing, because it means what you're doing is important, and it makes you more prepared. So we thank you for being here. And the first matter is Alex Romero Medrano, 24-6346. And each side has 10 minutes, and by the calendar, I see that the, it's my understanding the supervising attorney is Peter Afrasiabi, is that correct? Okay. And so you are here supervising two students, Victor Bao and Carlos Fairbanks, whom we've given permission to argue today, is that correct? And then we also have, I'm guessing, Mr. Barrow? Yes, Your Honor. All right. Thank you. And so I think we're ready to proceed. Good morning. Good morning, Your Honors. May it please the court. I'm Daniel Barrow, representing Sergeant Roberts and Officer Acosta, both of whom are entitled to summary judgment unless their conduct violates clearly established law. Mr. Medrano, even with the expert assistance of Mr. Afrasiabi and his law students, and they did a fantastic job on that appellee brief, but they couldn't find any case that meets the strict requirements of the most recent Supreme Court case, Zorn v. Linton, as to a case that will clearly establish that these officers not only violated the Constitution, but violated clearly established law by holding... Why doesn't Robinson establish, you know, we said pretty clearly in Robinson, you can't point a gun at somebody's head. They didn't put their guns to his head. I said point. They pointed their guns 10 to 20 feet away. But Robinson had clearly different facts in that Mr. Robinson, who was suspected... The point of the case was that they pointed, you know, the claim was that he pointed a gun at his head. That was the point. The point of the gun... That's the whole case. The whole case is the facts that led up to that. The facts that led up to that was that he was suspected of, at most, a misdemeanor of using a shotgun. He approached the police officers parked outside of his house, not carrying a shotgun, unbuttoned shirt, walked up to them. He was an ex-police officer, so he knew the drill. The police officers came up to him and... Was he an ex-police officer? Yes. Who was? Mr. Robinson, the plaintiff in Robinson. Oh, Robinson. Okay, you're talking Robinson. You're not talking our particular case. So here's... And I'm going to sort of give a heads up the area that I want to explore, both for you and for your friends on the other side that will be arguing, because here's... Obviously, I want you to articulate what was in the officers' minds at the time that they were making this, but my concern is that what the district court... If it were to stand, what the district court is basically telling officers, if you're in fear of your safety, that you can't make a felony sort of arrest type of situation. So if the case were to stand, then every situation where the officer feels that they have information, that they believe the person is dangerous, and they have to do sort of a high the way that it is. And I don't know that that can be right, because we don't know... I think the officers would have to have some discretion going out when they're stopping people that they think are dangerous. Now, I mean, it might be a different situation if you put the gun in their ear or you put it to their actual head, but I've seen a lot of cases throughout and when officers are making stops and they're worried about it, they go out guns drawn until they can control the situation. So why don't you tell me what the officers, what they knew, what was in their mind. I don't think this is a great area, but I don't think the officers ever said that the area was something that was in their mind. They did say, Your Honor, that the area was something that was in their mind. They both submitted... Where did they say that? I know it's in the briefs, but I didn't... Where in the record did the officers say? Is it Bell Garden or somewhere where we were? They both... It is Bell Gardens. They both submitted declarations. They're pretty much identical on what they considered, so I'll read from Officer Acosta's declaration at page 156 of the excerpts of record, paragraph 10. Due to Medrano's history with BGPD, his flight from officers, his fugitive status, the pending felony drug charges, his known dog in the backyard, the fact that Medrano had not been searched for weapons, as well as the time, evening, and location, high crime area, Officer Roberts and I contacted Medrano with guns drawn for officer safety and commanded him to approach our position. In terms of where the gun was pointed, well, first we had him point them over a six-foot fence, so there's only so many places they could point them. In fact, I think Mr. Medrano in his testimony says, They must have been pointing them at my head because they were pointing them over the fence. And in terms of pointing them at the head as opposed to center mass or someplace else, I'm not sure how significant that is because if you point a gun anywhere at somebody's body, there's the possibility of killing them. That they could shoot you. That was my question. Is it a difference? I mean, it seems like the district court made a difference between pointing at the head versus center mass. Is that right? And why would that make a difference? It only seems to make a difference, Your Honor, in those cases where the gun is put at right at somebody's head, such as the Thompson case. At close range, right? Was that at close range? Yes. There are certain recurring themes in these cases where pointing a gun at somebody's head or other body is found to be excessive. The person has already been searched. The person is under guard, as in Thompson. Prolonged holding them at gunpoint after the lack of, after the possibility of threat has disappeared. Holding the gun barrel to their head and threatening to kill them, as in Thompson. Minor or no, misdemeanor or no crime suspected. The person is handcuffed. The person is a child. Or the person as in... Does it matter that the warrant here had, in fact, been recalled, but the officers don't know that? I guess that's undisputed. They still believe it's outstanding. It does not matter, Your Honor, because the CLETS, which they checked beforehand, which is in the record, showed that the warrant was still out there. And they were certainly entitled to believe that, even if it was a misdemeanor. Let me see if I can... Maybe it's just a clarification of the record for my benefit. So they arrive at the scene, right? Yes. And they see him on the other side of the fence in the yard, is that correct? And as they get out of their van, or their cars, they pull out their guns and they point them, correct? They get out of their cars. They see he's gone into his backyard. They go along the neighbor's driveway. Down that driveway from the photos. They go down that driveway with their guns. And they pull out their guns and then they command him to approach them. So he's on the other side of the fence, though. Right. Okay. And they say, we need you on this side. Right. Or whatever they say. I don't know whatever they said to him. Exactly what they say is it did the record. And he didn't recall. Right. But they tell him to come over. Right. So he climbs over the fence? Steps on a pallet of building materials, climbs over the fence. They keep the guns trained on that. And when they see him go over the fence, did they see any gun or any weapon or anything? They did not, but they didn't know that there wasn't one. Well, but how was he using his hands to get over the fence? They don't know if he's going to use his hands. Well, I'm asking you, what did they see him do when he came over the fence? Climb over the fence. Using his two hands, correct? Yes. And did he have anything in his hands when he went over the fence? No. It doesn't mean he didn't have something on him. No, I understand that. But by that time, let me ask you this, by that time, how close were the cops to him and the fence? Since they were 10 to 20 feet away from him when he was in the yard, he would be maybe six feet away when he climbed over the fence, five to six feet away. And still close, and they would, under the command of cases such as Mueller versus Mena and Let me ask you this, at what point did they holster their guns or whatever they do with their guns? When he was over the fence, they holstered their guns and handcuffed him and he was under arrest. As soon as he came over the fence? That's the indication, yes. He landed, his feet land on the driveway side and they put their guns away. The record isn't that detailed, but that appears to be the situation.  Well, this is an unusual case in the sense that, now, you would concede if they had shot him as he was going over the fence and he's not pointing a gun at them or whatever, that you wouldn't have, that we'd probably be having a trial on that, whether because they hadn't seen a weapon and he's using his hands and the questions. But here, it wasn't a question of whether they were going to shoot him. They didn't shoot him. The question was to take him into custody, what are they allowed to do for their safety before they can ascertain whether he has any weapons on his person or, you know, anything along those lines, right? Yes, Your Honor. So, he had run from the police previously, too, right? A few weeks before? Correct, from a traffic stop. Okay, all right. Let me ask you another question. Is it your position that a reasonable jury on these facts could find a constitutional violation, but that really what's in play here is that the officers are entitled to qualified immunity because the relevant case law was not clearly established on it? It didn't sort of fall within these kinds of parameters? It's our position that the officers are entitled to qualified immunity on both prongs because a jury could not find that their use of force was unreasonable, especially in light of cases like Mueller v. Mania and Ratelli from the U.S. Supreme Court saying that officers are entitled to hold guns even on non-suspects in search areas to maintain control. We even have that Houck case from a district court that was decided last year that said that there was no case that found excessive force. No court has found excessive force was used because officers temporarily pointed their guns securing a residence in the execution of a warrant, Houck v. United States, Eastern District of Pennsylvania, 2025. Off the orchard, I'm not going to even try to pronounce that by greater force. Let me ask you this. If we agreed with you on the second prong, we could just assume that there was a constitutional violation and move on to the second prong or not even say anything about the constitutional violation. Correct, Pearson v. Callahan, yeah. Right, or if we decided on the first prong, then we wouldn't have to say anything about the second. We don't have, under the Supreme Court's guidance, we don't have, we can decide both issues or we can decide one or the other, correct? Correct. Okay. All right, thank you. We've used all your time and more. You didn't say what you wanted. What was your aspirational rebuttal? Well, three minutes. Okay, what I'm going to do is I'm going to give you two because we used up all your time. And if we have any additional questions, I'll give you two minutes for rebuttal, okay? Thank you, Your Honor. All right, we'll hear from, I'm not sure, is Mr. Bowe going first? Okay, so that would be Mr. Fairbanks is going first. Good morning. Please state your appearance for the record. And I believe you plan to use five minutes, is that correct? Yes, Your Honor. All right, thank you. Good morning and may it please the Court. My name is Carlos Fairbanks, and I'm a certified law student under supervision of Peter Afrasiabi. My partner, Victor Bowe, discussed the clearly established prong of qualified immunity. I will address the question of excessive force. In that vein, this Court should affirm this Court's ruling that a reasonable juror could find the defendant officer's conduct in pointing their guns at Medrano's head was excessive. To account for their actions, defendant officers rely on a series of inferences, but those inferences must be weighed against the facts. And those facts, when taken in the light most stable to Medrano, are the following. That at least seven officers were dispatched for a bench warrant, not for a violent offense, but for a failure to appear. That when they arrived, there was no indication Medrano was armed. It was a failure to appear on what kind of crime? A drug sentencing hearing, Your Honor. That when they arrived— And in the cleats system, is that what it's called here in Los Angeles? Cleats or is it cleats? Cleats or whatever it's called. I can't remember what I used to refer to it as, but it showed what the offense was that he failed to appear on, correct?  Right. So they knew that he'd failed to appear on a serious drug offense. Yes, Your Honor. Okay. Nevertheless, when they arrived, they did not find that he was armed, violent, or noncompliant. They don't—Mr. Fairbanks, here's my concern, and I sort of gave you—that I was going to ask you this going into it. If we leave this to stand, basically, this tells officers when—that they can basically never pull their gun if they're—when they're making an arrest and they're going into things they don't know if someone's armed. You don't—you know, a child could be armed for all of that, that they don't know that. They know the guy ran on a—from the police. They know his mother's called the police. They know that he failed to appear in the CLET system. That warrant is there, and they can't see everything, and they know there's a dog over there. Why is it—why should an officer have to not be able to be prepared to use force until such time that they're absolutely sure that the person isn't armed and they've—they've got the situation controlled? Your Honor, officers certainly can make reasonable inferences, but ultimately, those inferences must harmonize with the facts, and you recount a number of past incidents— But you and I sit behind desks, and the worst thing that's going to happen is our pencil's going to break, and it's going to go at us. Officers have to go out in the—in a bad area of town. They have to where they can't see everything, and they—and these are people that have already come in contact with the law, and the way that it is wants to tell them, hey, you can't be concerned about your safety, and you can't make essentially a felony arrest until such time that you know you're safe. That's what this stands for. So tell me why that's right, why every time an officer's—that now officers just can't draw their guns unless they're sure someone's armed. Well, Your Honor, it's not a matter simply of them drawing their guns. It's a matter of them employing the threat of deadly force. Well, but that's drawing your gun. Anytime someone points a gun at you, you can die, and they shouldn't. So that is deadly force. You're right. Well, Your Honor, for instance, the court in Green v. City and County of San Francisco acknowledged that when utilizing their firearms, officers can use a low-ready position, meaning they can draw their firearms but keep them low as opposed to pointing them directly at a suspect. Well, would that have worked in this situation where there's a fence between them? Potentially, Your Honor. I mean, it's possible they could have shot through the fence if they felt the need to. But more importantly, what was the actual— Go ahead. What was the actual threat posed by Madrona? Did the officers know whether he's armed or not? They did not know. Okay. What could they see when, you know, when they were approaching the fence? They saw him in the backyard. They saw— What did they—you know, that fence looked pretty tall. It looked like it was at least six feet. So how could they see over the fence? I don't quite understand. Well, they were able to see through these metal sheets in the fence. So they saw him back there? Yes, they were able to identify him. And did they testify at their depositions that he was carrying anything? No. His hands were visible throughout the incident. Okay. And when he got to the fence, how did he get over the fence? He climbed over the fence. How? With his hands. And then what? He jumped over? Yes. And he fell down—did he land—how did he land? The record isn't clear, but presumably on his feet, at which point he was handcuffed and arrested. Right as he came—right as he landed? Yes. When did they holster their guns or put them away? The record isn't clear, but presumably it was once he had been effectively handcuffed and detained. So this is all about—what the concern is, is that he was pointing his gun—the officers were pointing their guns, assuming it was bows, at him while he was coming over the fence? Yes, Your Honor. Do you have any case that says an officer has to wait until someone draws a gun before they can draw theirs? No, Your Honor, but there must be objective factors to believe that there is a safety risk. Well, what if he had something in the back—in his pants? What if he—do they have to wait for him to pull it out of his pants before they can draw—they might have to shoot him, but on the other hand, what your—this case stands for the proposition they can't draw their guns in anticipation that someone will pull a gun and they don't know whether they're armed or not. But, Your Honor, that could be true of any suspect. In this case, you had a compliant one. It can, but in this situation, it's—is—would you agree with me that this case stands for the proposition that you can only draw your gun when someone's pointing a gun at you? No, Your Honor. Okay. What does it stand for, the way it is right now? What proposition does it stand for? Much like in Thompson v. Rahr, that pointing guns at compliant individuals who are presenting no threat is a constitutional violation. In Thompson, was the person shot? No. Okay, and what was the pointing at the person in Thompson? Police officers pointed a gun at an individual who had been compliant with their instructions up to that point. Wasn't it also a point-blank range? Here, is there an allegation the same? There isn't a difference in terms of distance. That makes some difference, don't you think? I mean, the terror of having a gun pointed right at your face this way, I assume, is magnified, but— Certainly, but as he complied with their instructions and approached, their guns were still trained on him. Okay. Do you—do we have any additional questions? Okay, well, we're two minutes over. Thank you for your comments and your argument here. All right, we'll hear from Mr. Baxter. Mr. Baxter, if you could please come up to the podium, and we'll start with Mr. Bao. Good morning. Good morning, Your Honors. May it please the Court, my name is Victor Bao, certified law student under supervision of Peter Afrasiabi. I'll be discussing the second prong, clearly established law. On the second prong, the district court got it correct in finding that the law was clearly established. However, we submit that Robinson v. Solano County is the most closely—close factual analog to the facts of this case, as to give officers reasonable notice, fair notice that their conduct would be unconstitutional. Well, they had a fairly good view of Mr. Robinson as he came down. That's correct, Your Honor. His shirt was unbuttoned, right? That's correct. That's correct. And his hands were up? That's correct, and he was also out in the open. But similarly here, Mr. Medrano, officers were able to observe Mr. Medrano as—prior to making any contact. Officers were able to— The fence was there, correct? That's correct, but an officer— Do we know what one could see through the fence? How clear could one see—how clear was the fence? It wasn't just a plain old chain-link fence without the plastic or metal shards that you sometimes see in a chain-link fence. This one had the plastic or whatever it was, wood or whatever. That's correct, Your Honor. It was a chain-link fence. So I imagine it wasn't—they didn't have a pretty good view, right? Your Honor, from the facts, I think we read them to have the officers at or near the fence so they could peer over it, presumably. Officers declared that they could just observe Medrano. They were able to see the pitbull dog presumably also at foot level of Medrano. So in this case, officers on approach, before Medrano even knew that they were there, they were able to see Medrano, presumably his entire person. Okay, do we have to—what would you have had the officers do? And did the officers—does it have to be 2020 retro? No, Your Honor. So how should the officers have made this felony stop? They have a felony warrant out. They know the guy's run. They know the guy's mother has said he was acting crazy. And they've got a—they can't see very well. And they've got a dog on the other side. And they—so what should they have done? What were they entitled to do, in your view, of the case? Sure, Your Honor. I mean, for the purposes of this appeal, we're considering guns drawn to the head. But as far as we know, there's no— But hypothetically, I'm asking you hypothetically, and we do that. So how should they have made this stop? I know you probably don't have a lot of experience making a felony stop. But tell me, should they have just had their hand on their weapon? Is that what they should have done? Or been ready? Or what would be allowable under the circumstances, as you see the law? What does the clearly established law allow them to do under these circumstances? Well, we haven't found any cases holding excessive force for guns just held in the low ready position or even for a protective sweep. In fact, I think we cite to the Bell Gardens Police Manual that is consistent with that kind of guidance. OK, but you're saying it's not OK, that the officers should have known that what they did was not OK. So what would be OK? If we publish on this, what should we say? What would have been OK for these officers in this stop? Sure, what would not be excessive, we would say, is officers having weapons at the low ready position. But once they're at the head, which is the boundary, the zone of excessiveness that was circumscribed by Robinson versus Solano County. Guns anywhere else, that would be an open question. If they were low ready, you wouldn't be here? No, Your Honor. OK. So you said that the closest analog was Robinson, right? Correct, Your Honor. OK, in Robinson, if I remember correctly, as the officers approached Mr. Robinson as he was walking down the steps, they had their guns out like this, right? Yes, that's correct, Your Honor. And it's pretty clear in that case that there was just a very short distance between the officer's weapons and Mr. Robinson, correct? That's correct, Your Honor. OK. So I gather what the concern here is, is that they had their guns up when he was on the other side of the fence and still had them out and pointing as he came over the fence, is that correct? That's correct, Your Honor. But how close were they to him at that time? Everything I read, I mean, he didn't testify that they were like two to three feet. Sure, on the facts of the case, excerpts of record 109, Medrano says, officers were as close as 10 feet initially at the first point. The first thing Medrano saw was officer's gun at his head and officer's declarations. But how could it be, as I think Judge Bumate or Judge Callahan said, you know, how could, or counsel said, I mean, how could that be? He just perceived it to be at his head, is that correct? That's correct. He's 10 feet, they're 10 feet away and he's on the other side of the fence and they have their guns out. That's correct, about as far as I can tell. So he perceives it, he perceives it that they're pointing their weapons at his head. That's correct, Your Honor. At about 10 feet, as close as 10 feet at first contact and we saw the analog to Robinson, which on the facts of page 1010 Robinson, the gun was as close at a range of 3 to 6 feet in Robinson. So we're talking about a difference of about force. So my problem with aligning with Robinson is that it says there's only one circumstance that favored the use of force in that case, the fact that the plaintiff had used a shotgun previously. Here you have to concede that there's more factors that support use of force, right? Well, Your Honor, we disagree on that. Well, okay, it was at night, there was a fence between them, there was a dog present, it was in a dangerous neighborhood. He had previously fled and he was accused of a felony drug possession, correct? Those are factors in favor of use of force. None of that was present in Robinson. That's true, Your Honor, but we submit that Robinson, the conduct that led to the arrest, the discharge of a firearm, and Mr. Robinson was roaming the streets with his firearm, that posed even a higher level of threat. Someone who had actually discharged a firearm versus a drug offence. But it was a shotgun also, right, with Robinson? And so they knew he didn't have a shotgun. That's correct, but that's assuming that Robinson could only ever have one firearm. So here, the appellants argue that Medrano could be armed and that he was not visibly carrying a firearm. But similarly, Robinson, even though he had also not been searched, I think we can't have it both ways in that Robinson would be unarmed. You don't think that they had a better view of Robinson under the circumstances? I would say under the facts on the record, in both cases, officers were able to see the entire person of the individual prior to pointing firearms at the head. All right, unless you have further questions, we've taken you over as well. So we've been, so I will give, we took your side about five minutes over. So I'll give you three minutes for rebuttal, all right, for the appellant. Thank you, Your Honors. Thank you. I guess what I'm most curious about here is we've talked about, we know under Callahan, which is not related to me, that you can decide under the first or the second prong. Is it important to decide this under the first prong as opposed to just jumping over that and going into the second prong from, I want your perspective on that. Your Honor, you can decide this on the second prong because even if this court were to make new law on the first prong and say that officers in this situation cannot point their guns at people's head, that would be new law in 2026 that would not be known to the officers in June 2018 and they would be entitled to qualified immunity on the second prong. Well, I find it hard to believe though that you would want us, if you represent the officers, to make new law that they can never have guns drawn in this situation. I mean, do you want that new law? Absolutely not, Your Honor. I would like the court to recognize the existing law as set forth in the U.S. Supreme Court that officers can use their guns to hold people at gunpoint to control the situation, even non-suspects, when executing a warrant. And here they reasonably believed they were executing a warrant, not just a warrant, but an arrest warrant, a bench warrant, for somebody suspected of a violent felony who was known to the police department and who had gang affiliations under situations. I mean, I gather you agree with Judge Callahan that if you read the district court's opinion, that this case stands for the proposition that cops can never, a police officer can never draw their gun as they're making a felony stop. I would, Your Honor. I'm interested in that. How do you draw that conclusion from this opinion on these facts? Because the district court focused on... I mean, an officer could always draw his gun and just keep it down, keep it ready to go. But the judgment as to whether it is necessary to only hold the gun at low ready or to aim it at the person who poses a substantial threat is something that an officer should have a discretion on. And, in fact, that Bell Gardens provision that Mr. Ebao pointed to, or Mr. Fairfax, Mr. Ebao pointed to, says that it's up to the officer's reasonable discretion as to whether to hold the gun at low ready. I mean, do you always want police officers to pull their weapons and have them ready to go? And then, you know, in an instant, they can pull the trigger and kill somebody. No, we don't want that always. But we do want a situation like this one where they're facing somebody who is facing charges of felony drug distribution and who fled from justice and who was cornered, possibly, and might act that way to have the guns ready just in case they're needed. Well, I'm going to assume, and I would hope, that everyone would like to go home that night, the defendant and the officers. So that everyone would like to go home and no one gets shot. But, you know, I guess that I'm wondering is, does this stand for the proposition that you have to let someone get the jump on you where you can't be fully ready to engage someone that may be armed? Or do you have to, you know, either stay holstered? Do you have to, I mean, I don't know. Is low ready? Do we micromanage officers and say you need to be low ready in that situation? I mean, I always get concerned. Like I said, I sit behind a desk and the worst thing I have is an irate law clerk or, you know, a pencil flipping up in my face. So if I'm going to tell officers how to do their jobs, I want to make sure that I am, you know, that I'm confident in that and what the law is. I agree completely, Your Honor. And that's why qualified immunity exists is so long as the constitutional point can be debated as even as we're debating it now, it shouldn't be taken as clearly establishing this officer can't do what the officer believes is necessary to protect themselves, protect the community and keep this person from fleeing. OK, I don't think we have any additional questions. Thank you, everyone here for your argument. And I would like to say that you you everyone did a good job here today. And so when you're when you're regular lawyers, you're welcome back. You did it. You know, you you were regular lawyers today. How's that? Thank you. Thank you, Your Honor. This matter will stand submitted.
judges: PAEZ, CALLAHAN, BUMATAY